# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

AMEENA BROWN and EVAN
BRAGGS, Individually and as Co-
Administrators of the Estate of A.B.,
deceased,

     Plaintiffs,

  v.

FISHER-PRICE, INC. and
MATTEL, INC.

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. N20C-01-067 PAW

Submitted: November 8, 2024
Decided: December 20, 2024

## MEMORANDUM OPINION AND ORDER

*Upon Consideration of Defendants' Motion to Exclude the Testimony of Plaintiffs'
Expert Benjamin Hoffman, M.D. Pursuant to D.R.E. 702;*

### DENIED.

Robert J. Leoni, Esq., Shelsby & Leoni, PA, *Attorney for Plaintiffs.*

Jennifer C. Wasson, Esq., Carla M. Jones, Esq., and Ryan Kingshill, Esq., of Potter
Anderson & Corroon LLP, *Attorneys for Defendants*.

**WINSTON, J.**

# I. INTRODUCTION[1]

Defendants move to exclude the expert testimony of Dr. Benjamin Hoffman under Delaware Rule of Evidence 702.[2] Plaintiffs seek to introduce Hoffman's testimony to show: (1) the use of inclined sleeper products place infants in a dangerous sleeping position, increasing their risk of Sudden Unexplained Infant Death Syndrome ("SUIDS");[3] and (2) the use of an inclined sleeper caused the death of the infant in the instant case, A.B.[4] Hoffman's report also touches on the topic of rebreathing.[5] Defendants contend: (1) Hoffman lacks expertise in biomechanics and cannot offer biomechanical opinions; (2) Hoffman improperly relies on studies incomparable to the facts of this case; (3) Hoffman did not utilize reliable methodologies when constructing his opinion; and (4) Hoffman relies on a theory of increased risk causation which is impermissible under Pennsylvania law.[6]

---

[1] This Memorandum Opinion and Order references the factual and procedural background outlined in the Court's Memorandum Opinion and Order upon Consideration of Defendants' Motion for Summary Judgment, which the Court incorporates by reference. Unless otherwise noted, defined terms are ascribed the same meaning as in the Court's Summary Judgment Memorandum Opinion.

[2] Defs.' Mot. to Exclude Pls.' Expert Benjamin Hoffman, M.D., D.I. 168; *see also* D.I. 169 ("Defs.' Ex. F-P"); *see also* D.I. 170 ("Def.'s Ex. Q").

[3] Pls.' Opp'n to Defs.' Mot. to Exclude Benjamin Hoffman, M.D., D.I. 209.

[4] Defs.' Ex. F, D.I. 169, at 18 ("Dr. Hoffman's Report").

[5] Dr. Hoffman's Report; Hoffman's testimony regarding rebreathing is examined in a separate Memorandum Opinion and Order.

[6] D.I. 168 at 2-3.

## II. STANDARD OF REVIEW

Delaware Rule of Evidence ("D.R.E.") 702 governs the admission of expert testimony. Under D.R.E. 702, expert opinion testimony is admissible provided that the witness "is qualified as an expert by knowledge, skill, experience, training, or education" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of the fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has applied the principles and methods to the facts of the case.[7]

The burden falls on the party seeking to admit the expert testimony to show, by a preponderance of the evidence, its admissibility under D.R.E. 702.[8] "Once expert testimony is challenged, the reviewing court must ensure that the proffered testimony is both relevant and reliable."[9] To fulfill this duty, this Court acts as gatekeeper, determining if "the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be

---

[7] D.R.E. 702.

[8] *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 795 (Del. 2006).

[9] *Scottoline v. Women First, LLC*, 2023 WL 2325701 at *3 (Del. Super. Mar. 1, 2023) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).

applied to the facts in issue."[10]  In making that determination, the Court applies a

five-step test that examines whether:

> (1) the witness is qualified as an expert by knowledge, skill, experience, training[,] or education; (2) the evidence is relevant [and reliable]; (3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field; (4) the expert will assist the trier of fact to understand the evidence or to determine a fact in issue; and (5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[11]

For scientific evidence to be deemed reliable, the testimony must be rooted in

science and derived from the scientific method.[12]  Expert testimony is relevant when

it assists the trier of fact to understand the evidence or determining a fact in issue.

Thus, the core of a *Daubert* analysis is the "principles and methodology" used in

formulating an expert's testimony, not on the expert's resultant conclusions.[13]  This

Court possesses "broad latitude to determine whether any or all of the *Daubert*

---

[10] *Gen. Motors Corp. v. Grenier*, 981 A.2d 531, 536 (Del. 2009) (internal quotations omitted) (quoting *Daubert*, 509 U.S. 579 at 592-93).

[11] *Norman v. All About Women, P.A.*, 193 A.3d 726, 729-30 (quoting *Smith v. Grief*, 106 A.3d 1050 (Del. Jan. 8, 2015)).

[12] *Daubert*, 509 U.S. at 590-94.

[13] *Bowen*, 906 A.2d at 794 (citing *Daubert*, 509 U.S. at 595).

factors are reasonable measures of reliability in a particular case."[14] "A strong

preference exists for admitting evidence that may assist the trier of fact."[15]

## III.   ANALYSIS

In his report, Hoffman opines A.B. died from suffocation caused by turning

onto his side.[16]  Hoffman further opines the design of the RnP "increased the risk of

harm of[,] and was the direct cause of[,] A.B.'s suffocation."[17]  Hoffman based his

opinion on his experience as a pediatrician, his review of A.B.'s medical records,

the witness statements of A.B.'s mother,[18] and certain studies.[19]

---

[14] *Grenier*, 981 A.2d at 536 (internal quotations omitted) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

[15] *Norman*, 193 A.3d at 730.

[16] Dr. Hoffman's Report at 19.

[17] *Id*.

[18] At oral argument, Defendants contended that all Plaintiffs' expert opinions were factually flawed because they failed to correctly account for the position of A.B.'s face as described by his mother in her deposition.  This assertion is incorrect.  *See* Dr. Calhoun's Report at 6; Dr. Hoffman's Report at 6; Dr. Mannen's Report at 5; Dr. Rosen's Report at 6; Dr. Ross' Report at 4.  Further, challenges to the factual basis of an expert opinion go to credibility, not admissibility.  An expert's testimony will be excluded on the factual basis grounds only in the narrow circumstance where the expert has completely neglected the core facts of the case. *See Henlopen Hotels, Inc. v. United National Insurance Co.*, 2020 WL 233333 (Del. Super. Jan. 15, 2020). This is not the case here.

[19] *Id*.

**A.      HOFFMAN QUALIFIES AS AN EXPERT ON INFANT SLEEP CONDITIONS.**

Defendants first argue Hoffman does not qualify as an expert in biomechanics.[20]    Defendants posit Hoffman's testimony "plainly rests on biomechanics."[21]    As Hoffman does not qualify as an expert in biomechanics, Defendants contend his opinion cannot be admitted as expert testimony.[22]

A review of Hoffman's report, and the supplemental letter he submitted in response to the Defendants' experts, shows Hoffman based part of his opinion on the biomechanical setting created by placing an infant in the RnP.[23]  A significant portion of his opinion, however, discusses both why the American Academy of Pediatrics (the "AAP") discourages the use of inclined sleepers, and how Hoffman ruled out other possible causes of death by examining A.B.'s records.[24]  Hoffman relies on his education and experience as a certified pediatrician, published reports, and the reports of other experts submitted for this case to render his opinion.

---

[20] D.I. 168 at 11.

[21] *Id*. at 13.

[22] *Id*.

[23] Dr. Hoffman's Report at 2 ("[A.B.]'s death was the result of biomechanical alterations manifested when …"; "These biomechanical alterations led to [A.B.] rolling from supine to his left side, leading to suffocation.").

[24] *See id*. at 7-13 (discussing SUIDS generally, as well as the efforts by the AAP and the Consumer Product Safety Commission (the "CPSC") to discourage or ban inclined sleepers); *see also id*. at 16-18 (discussing Dr. Hoffman's methodology for ruling out other possible causes of A.B.'s death).

Although his opinion contains discussions of biomechanical concepts, Defendants mischaracterize Hoffman's opinion as biomechanical testimony. As Defendants noted, "Dr. Hoffman could have used any words or phrases to describe his opinion, and he chose to frame it explicitly in biomechanical terms …"[25] Hoffman could have chosen less technical terms to reach the same conclusions. Merely using those technical terms does not transform his opinion into one only a biomechanical expert could render. Hoffman's training, education, and experience qualify him as an expert on the safety of infant sleeping conditions.

## B. HOFFMAN MAY RELY ON MANNEN'S STUDIES TO SUPPORT HIS OPINION.

Hoffman bases part of his opinion on the work of another proposed expert witness, Dr. Erin Mannen.[26] Plaintiffs' contention that Hoffman's opinion does not rely on Mannen's studies in any way runs contrary to the two full pages Hoffman devotes to discussing Mannen's findings.[27] Defendants argue this reliance undermines Hoffman's report because Mannen's findings lack credibility, do not support Hoffman's conclusions, and cannot be applied to the facts of this case.[28]

---

[25] D.I. 168 at 12.

[26] Dr. Hoffman's Report at 14-16.

[27] *Id*.

[28] D.I. 168 at 17-23.

Defendants have filed a separate motion challenging the admissibility of Mannen's expert testimony, but the admissibility of her testimony does not materially affect the analysis of Hoffman's opinion. Even if inadmissible under D.R.E. 703, an expert may base their opinion on inadmissible evidence as long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject …" Thus, the analysis must center on whether Mannen's studies and publications are the kind a pediatrician would reasonably rely upon.[29]

Hoffman relies on three of Mannen's studies: (1) a 2019 study commissioned by the CPSC analyzing inclined sleep products for infants;[30] (2) a peer-reviewed study published in the Journal of Biomechanics in 2020 on inclined sleep surfaces and infant muscle activity;[31] and (3) a peer-reviewed study also published in the Journal of Biomechanics in 2021 on infant inclined sleep product design.[32] Defendants posit the CPSC study cannot be relied upon as it did not undergo peer

---

[29] D.R.E. 703; *see also Norman*, 193 A.3d at 730.

[30] Defs.' Ex. J, D.I. 169.

[31] Defs.' Ex. K, D.I. 169.

[32] Defs.' Ex. L, D.I. 169.

review.[33]  Whether a study has been subjected to peer review factors into the Court's analysis of the reliability of the study.[34]

Peer review, however, stands as one part of a "flexible inquiry" that also considers whether the theory in question has been tested, any potential error rate associated with the study, standards controlling the study, and whether the underlying reasoning or methodology has attracted widespread acceptance within the relevant scientific community.[35]  A study's lack of peer review does not necessarily render it unreliable.

Mannen generated the CPSC report in response to a request from the U.S. government, not an academic publication.[36]  The CPSC report examined the results of scientific testing, carefully outlined the methodology used and the associated limitations, and appears to have at least partially spurred legislative action to recall products like the RnP.[37]  Accordingly, the Court finds that the CPSC report authored by Mannen, despite its lack of peer review, is sufficiently reliable within the relevant scientific community.  Mannen's CPSC study involved a methodology that attracted

---

[33] D.I. 168 at 15.

[34] *Daubert*, 509 U.S. at 580.

[35] *Id*.

[36] Defs.' Ex. J, D.I. 169.

[37] *Id*.; *see also* D.I. 209 at 24.  Mannen's CPSC study caused the CPSC to implement tighter safety regulations for inclined sleepers.  D.I. 211 at 2.

9

widespread acceptance in the scientific community and was controlled by CPSC standards, and, as a result, constitutes the type of information reasonably relied upon by experts in pediatrics.

The other studies referenced by Hoffman were published in a reputable biomechanics journal. The two studies were subjected to peer review and publication, and the methodology within those studies gained acceptance within the scientific community. The studies were cited in other peer-reviewed work within scientific journals on early human development, pediatric child health, and public health.[38] Accordingly, Mannen's other studies constitute the type of information reasonably relied upon by experts in pediatrics, and Hoffman's reliance on those studies does not preclude him from offering his opinion.

Defendants also assert all three of the studies are inapplicable to the instant case because they cannot be applied to the specific set of facts present in this case.[39] As the infant in this case suffered from a medical condition causing tight muscles

---

[38] *See* Laura R. Sangaré et al., *The Risk of Sleep-Related Death in an Inclined Sleep Environment*, 24 BMC PUB. HEALTH 1 (Aug. 12, 2024) (citing Dr. Mannen's study from the Journal of Biomechanics in 2020); *see also* B.C. Galland et al., *Prone Versus Supine Sleep Position: A Review of the Physiological Studies in SIDS Research*, 38 J. PAEDIATRICS & CHILD HEALTH 4, 322 (Aug. 2022) (citing Dr. Mannen's study from the Journal of Biomechanics in 2021); *see also* Danielle N. Siegel et al., *Commercial Infant Products Influence Body Position and Muscle Use*, 198 J. EARLY HUMAN DEV. 106122 (Sept. 12, 2024) (citing Dr. Mannen's study from the Journal of Biomechanics in 2021).

[39] D.I. 168 at 20.

and limited range of motion, Defendants posit studies involving infants without similar medical conditions are inapplicable.[40] Further, Defendants note Mannen's studies involved tests using infants wearing only a diaper, not a full swaddle and multiple layers of clothing as in the instant case.[41]

D.R.E. 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." "[A]n expert's methodology must be not only reliable intrinsically but also be reliably applied to the facts of the specific case …"[42] Defendants characterize this concept as requiring any study relied upon by an expert to have occurred under near-identical circumstances to the facts of the instant case.[43] This contention is addressed in the Memorandum Opinion and Order concerning Mannen's expert testimony. For the reasons set forth in that decision, the Court finds there is no merit to Defendants' contention that Mannen's studies, and the subsequent opinions based on those studies, stand too far removed from the facts present in this case to be admissible.

---

[40] *Id.*

[41] *Id.*

[42] *Gen. Motors Corp. v. Grenier*, 981 A.2d 524, 529 (Del. Feb. 4, 2009) (internal quotations omitted).

[43] D.I. 168 at 20.

Mannen's three studies sufficiently fit the facts of the case and constitute sources reasonably relied on by an expert in pediatrics; accordingly, Hoffman's reliance on Mannen's three studies will not preclude him from offering his opinion.

### C. HOFFMAN'S OPINIONS FORMED USING DIFFERENTIAL DIAGNOSIS METHODOLOGY ARE ADMISSIBLE.

In determining the cause of A.B.'s death, Hoffman utilized a differential diagnosis technique, essentially ruling out all other possible causes of death until concluding the inclined environment of the RnP caused A.B.'s death.[44] Defendants argue Hoffman utilized a flawed technique and take issue with Hoffman's grouping of potential diagnoses by systems.[45] Defendants further posit Hoffman failed to consider several alternative causes of death, and his failure to rule out those causes renders his diagnosis inadmissible.[46]

"A differential diagnosis is deemed reliable for *Daubert* purposes if it is rendered after the physician conducts a physical examination, takes a medical history, reviews clinical tests, including laboratory tests, and excludes *obvious* (but not all) alternative causes."[47] A doctor does not need to utilize all of those techniques

---

[44] Dr. Hoffman's Report at 16-18.

[45] D.I. 168 at 26-27.

[46] *Id*. at 29-32.

[47] *State v. McMullen*, 900 A.2d 103, 117 (Del. Super. 2006).

12

to create a reliable differential diagnosis.[48] "For instance, a physician may reach a reliable differential diagnosis without himself performing a physical examination, particularly if there are other examination results available."[49] This Court must "delve into the particular witness's method of performing a differential diagnosis to determine if his [ ] ultimate conclusions are reliable."[50] "So long as physicians employ objective diagnostic techniques when performing a differential diagnosis, their diagnosis will be reliable under *Daubert* ..."[51] Differential diagnosis can be a difficult method to test for reliability, with variance from case to case, and requires the Court to employ a "flexible" analysis regarding admissibility.[52]

Defendants raise several issues with Hoffman's methodology, but those relate to the credibility of his opinion, not its admissibility. First, Defendants' objection to Hoffman's use of systems to categorize different potential causes is easily dismissed. Nothing about Hoffman's organization of his report suggests that his methodology differed in any material way from a differential diagnosis organized in another way.

---

[48] *Id*.

[49] *Id*. (internal quotations omitted) (quoting *Kannakeril v. Terminix Intern., Inc.*, 128 F.3d 802, 807 (3d Cir. 1997)).

[50] *Id*. (internal quotations omitted) (quoting *Poust v. Huntleigh Healthcare*, 998 F.Supp. 478, 496 (D.N.J. 1998)).

[51] *Id*. at 117-18.

[52] *Id*.

Defendants' hyperfocus on the use of the word "systems" throughout Hoffman's report appears to misapprehend Hoffman's approach.

Defendants argue Hoffman's report does not adequately consider whether A.B.'s medical conditions could have contributed to his alleged suffocation. Hoffman opined A.B.'s medical conditions did not place him at an increased risk of death, and that A.B. appeared to be at his "baseline state of health" the day of his death.[53] Hoffman's supplemental report elaborates further on his opinion that A.B.'s medical history did not contribute to the cause of death.[54] Hoffman ultimately determined A.B. rolled onto his side and died as a result.

Defendants next contend that Hoffman overlooked other plausible causes of death. An expert does not, however, need to "rule out all possible causes of a patient's injury ..."[55] Hoffman's report explains that SIDS refers to any unexplainable death of an infant.[56] Hoffman notes that SIDS can be distinguished from Accidental Suffocations or Strangulation in Bed ("ASSB") when the infant dies in a sleep environment where their nose and mouth were obstructed.[57] Plaintiffs

---

[53] Dr. Hoffman's Report at 6.

[54] D.I. 209 Pls. Ex. K at 1-2.

[55] *McMullen*, 900 A.2d at 116 n.63 (quoting *Creanga v. Jardal*, 886 A.2d 633, 639 (2005)).

[56] Dr. Hoffman's Report at 7.

[57] *Id*.

14

allege such obstruction occurred in this case; thus, Hoffman's report effectively rules out SIDS as a possible cause of death. Defendants may attack the credibility of that conclusion in cross-examination.

Further, while Hoffman's initial report did not consider overheating as a potential cause of death, Hoffman considered overheating as a potential factor in A.B.'s death in his supplemental report. In that report, Hoffman explained the temperature of the house coupled with the clothing A.B. wore led Hoffman to determine no increased risk of overheating existed.[58] Specifically, Hoffman noted that parents are advised to dress their infants in one layer of clothing more than an adult would be comfortable wearing to maintain a safe temperature.[59] Hoffman's conclusion that A.B. was dressed appropriately may be contested during cross-examination.

The guidance from previous cases considering the admissibility of a differential diagnosis stresses the need for flexibility, and *Daubert* leans toward admissibility if the information may assist the trier of fact. Accordingly, Hoffman's conclusion on A.B.'s specific cause of death, based on his examination of the facts and his training and experience, is admissible.

---

[58] D.I. 209 Pls.' Ex. K.

[59] *Id*. at 2-3.

15

**D.      HOFFMAN CANNOT RELY ON INCREASED RISK OF HARM TO ESTABLISH CAUSATION.**

Defendants' final challenge to Hoffman's report centers on Hoffman's statement that the RnP put A.B. "at increased risk for sleep related death."[60] Pennsylvania law does not permit the use of "increased risk" testimony to establish causation in products liability cases.[61] Defendants argue because Hoffman noted the RnP's design led to an increased risk, and subsequently based his opinion on that notion, Hoffman's opinion cannot be admitted as causation evidence.[62]

Pennsylvania law does not permit the use of "increased risk" testimony to establish causation in products liability cases.[63] At oral argument, Plaintiffs acknowledged that increased risk standing alone does not equal causation under

---

[60] D.I. 169 at 24 (quoting Dr. Hoffman's Report at 18).

[61] *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 227 F. Supp. 3d 452, 487 n. 28 (D.S.C. 2017), *aff'd sub nom. In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.* (No II) MDL 2502, 892 F.3d 624 (4th Cir. 2018); *see also Lempke v. Gen. Elec. Co.*, 2012 WL 94547, at *4 (W.D. Pa. Jan. 11, 2012) (finding increased risk as causation only applied to situations where the defendant has a duty to perform an act, or where defendant undertook an obligation to perform an act).

[62] D.I. 169 at 24.

[63] *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 227 F. Supp. 3d 452, 487 n. 28 (D.S.C. 2017), *aff'd sub nom. In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.* (No II) MDL 2502, 892 F.3d 624 (4th Cir. 2018); *see also Lempke v. Gen. Elec. Co.*, 2012 WL 94547, at *4 (W.D. Pa. Jan. 11, 2012) (finding increased risk as causation only applied to situations where the defendant has a duty to perform an act, or where defendant undertook an obligation to perform an act).

Pennsylvania law because the jury must later decide whether the increased risk was a substantial factor in achieving causation.[64] After extensive argument, Defendants conceded their position with Plaintiffs as they "understood counsel to be acknowledging that they were not trying to substitute increased risk for proof of causation."[65] Here, Hoffman offers a basis for specific causation which goes beyond his reliance on increased risk. Moreover, Defendants have conceded that Plaintiffs are not attempting to substitute increased risk for causation. Accordingly, Hoffman may not testify that increased risk establishes causation.

## IV. CONCLUSION

Hoffman utilized an admissible differential diagnosis to determine A.B.'s cause of death. Although Hoffman may not have fully addressed some of the alternative explanations proposed by Defendants, those explanations may be explored via cross-examination at trial. *Daubert* and the line of cases interpreting its application in Delaware courts advise erring on the side of admitting expert testimony if it will assist the trier of fact. Here, Hoffman unquestionably qualifies

---

[64] Pls' Suppl. Br. at 12; Tr., Oral Argument, C.A. No. N20C-01-067 PAW at 102:23-104:4. Plaintiffs further clarify that "[t]his increased risk argument is really an argument to the point of what will the jury instructions look like and what will the arguments look like to the jury, but it is absolutely a proper basis by which causation can be proved." *Id*. at 107:13-19.

[65] Tr., Oral Argument, C.A. No. N20C-01-067 PAW, at 147:7-15.

as an expert on infant safety conditions, including infant sleep conditions, and his opinion reflects that expertise.

Hoffman does rely on Mannen's reports and some biomechanical principles, but Hoffman does not frame his testimony as that of a biomechanical expert and does not attempt to provide expert testimony in the realm of biomechanics. For these reasons, the Court shall admit Hoffman as an expert witness. He is prohibited, however, from testifying that increased risk establishes causation.

**IT IS SO ORDERED.**

/s/ *Patricia A. Winston*
**Patricia A. Winston, Judge**